Shyam Chetal
2090 Warmsprings Ct. Suite 280
Fremont, CA 94539
Phone: (510) 366-1884
ShyamChetal@yahoo.com
Petitioner

FILED

JUN 2 6 2015

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

JUNE 25, 2015

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

CASE No. **C15- 2990**

| | |
|---|---|
| SHYAM CHETAL, | CASE No. **C15- 2990** |
| Petitioner, | |
| vs. | **COMPLAINT FOR COST RECOVERY, CONTRIBUTION, AND DECLARATORY RELIEF [42 U.S.C.A. §§ 9607, 9613; Health & Saf. Code, § 25363, subd. (e)]** |
| GINA MCCARTHY, ADMINISTRATOR, U.S. ENVIRONMENTAL PROTECTION AGENCY, JARED BLUMENFELD, REGIONAL ADMINISTRATOR, U.S. ENVIRONMENTAL PROTECTION AGENCY REGION 9, SAN FRANCISCO, CALIFORNIA, MATTHEW RODRIGUEZ IN HIS OFFICIAL CAPACITY AS SECRETARY FOR THE CALIFORNIA ENVIRONMENTAL PROTECTION AGENCY, MR. MUNTU DAVIS IN HIS OFFICIAL CAPACITY AS DIRECTOR OF THE ALAMEDA COUNTY , STATE OF CALIFORNIA, PUBLIC HEALTH DEPARTMENT, CITY OF FREMONT COMMUNITY DEVELOPMENT DEPARTMENT – PLANNING DIVISION, BILL HARRISON, MAYOR, CITY OF FREMONT AND THE CITY OF FREMONT COMMUNITY DEVELOPMENT DEPARTMENT, | **AND** |
| | 42 U.S.C SEC 9659, 42 U.S.C SEC 103(i), 42 U.S.C SEC 9613 (i), 42 U.S.C SEC 9601 |
| | **[COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF]** |
| LENNAR HOMES, A FLORIDA CORPORATION, | |
| TOLL BROTHERS, A NEW YORK CORPORATION, | |
| VALCO LLC, A CALIFORNIA CORPORATION, | |
| AND DOES 1-100. | |
| Respondents. | |



COMPLAINT                                                                      1

## I. Introduction

Petitioner Shyam Chetal pursuant to 42 U.S.C.A. § 6972 requests that this Court take jurisdiction of this case and after review of the exhibits file in support of his multi-faceted claim against the Environmental Protection Agency, and other Defendants for its failure in its non-discretionary duty to review the Final Environmental Impact Report of the City of Fremont, California and to enter a series of injunctions involve the Warm Springs/South Community Site that:

1) Require the Environmental Protection Agency to complete an independent audit and review of all of the environmental reports prepared by the City of Fremont, California certified that the proposed Warm Springs Project is or is not compliant with the provisions of the Clean Air Act (42 U.S.C.A. § 7412); the Clean Water Act (33 U.S.C.A. §§ 1317(a)) and 1321(b)(2)(A); RCRA (42 U.S.[1]C.A. §6921; and the Toxic Substance Control Act (15 U.S.C.A. § 2606). [42 U.S.C.A. § 9601(14)] Substances specifically designated as hazardous substances under CERCLA are listed in 40 C.F.R. § 302.4.

2) Upon notice and after a full comprehensive review by the representatives of the Environmental Protection Agency, enter a temporary restraining order directed to Mr. Bill Harrison, Mayor of the City of Fremont, California and the City of Fremont, California and their responsible officers who prepared the Environmental Declaration of July 23, 2014 issuing an Environmental Impact Report which permits the defendants Lennar Homes, Toll Brothers and VALCO LLC to proceed with the implementation and/or construction of the Warm Springs Fremont Construction Project, which restrains

---

[1] The "Site" in this compliant is the Warm Springs/South Fremont Community Plan which covers the +879 acres generally bound by I-880 on the west, I-680 on the east, Auto Mall Parkway on the north, and Mission Boulevard on the South.

those defendants from any construction within the City of Fremont until the Environmental Protection Agency by its Administrator Gina McCarthy and Jared Blumenfeld certified by written report to this Court through an independent audit that the proposed Warm Springs Project of the City of Fremont is free of environmental hazards and in fact complies with all sections of the National Environmental Policy Act (NEPA).

3)   Require the Environmental Protection Agency to complete an independent audit and review of all of the environmental reports prepared by the Bay Area Air Quality Management District who issued to Tesla Motors Inc. Facility # A1438 at 45500 Fremont Boulevard, Fremont, California 94538, on October 28, 2010 a conditional permit requiring a complete application and renewal permit on or before June 2, 2015. The subject expired on June 2, 2015 as a result of documented environmental hazards under the former NUMI plant which pollutants during the past ten years have gone into the underground soil and water systems and created hazardous conditions where the Warm Springs Project has been certified for construction by the City of Fremont and its Mayor Bill Harrison, of Fremont, California, despite historic evidence that the Tesla Motors Facility is in violation of the provisions of the Clean Air Act (42 U.S.C.A. § 7412); the Clean Water Act (33 U.S.C.A. §§ 1317(a)) and 1321(b)(2)(A); RCRA (42 U.S.C.A. §6921; and the Toxic Substance Control Act (15 U.S.C.A. § 2606).  [42 U.S.C.A. § 9601(14)] Substances specifically designated as hazardous substances under CERCLA are listed in 40 C.F.R. § 302.4.

4)   Order after an Evidentiary Hearing, the State of California, by its Secretary for the California Environmental Protection Agency by Matthew Rodriguez to conduct an Independent Report to this Court that the Warm Springs Site in Fremont, California is

Environmentally safe, and Mr. Muntu Davis to complete Independency that the Proposed

Site and Tesla Plant are in compliance with CAL GOV. CODE 65850.01 AND 02.

5) Enter an order upon notice and motion and briefing to TEMPORARY INJUNCTION

restrain and enjoin the Superior Court Judge, Department 14, the Honorable Evelio

Grillo,  in the Superior Court of California Alameda County Unlimited Civil Jurisdiction

in **Case No. HG 14737711, Shyam Chetal v. City of Fremont Community**

**Development Department Planning Division**, from proceeding with a final non-jury

trial scheduled for **September 15, 2015** at 1:30 p.m., upon the grounds of the exclusive

Federal Jurisdiction of this Court, and the request of this Petitioner seeking the immediate

intervention of the Environmental Protection Agency  by the Administrators of this

Petition, Gina McCarthy and Jared Blumenfeld, to make an immediate assessment of the

hazards of pollution that will be created in violation of THE ENVIRONMENTAL

PROTECTION ACT, which relief was not sought in my petition filed on January 12,

2015 in my FIRST AMENDED PETI TION FOR WRIT OF MANDAMJUS;

ADMINISTRATIVE MANDAMUS (CCP 1085 et seq., 1094.5 set seq.; Pub. Resources

Code Section 21000, et seq.).

## II. JURISDICTION

This action arises under the Comprehensive Environmental Response, Compensation and

Liability Act ("CERCLA"), title 42, sections 9601 et seq. of United States Code, as amended by

the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499, 100 Stat.

1613 (1976), and California Health and Safety Code § 25363, subd. (e) and

All of plaintiff's claims for relief contained in this complaint arise out of the same transaction and occurrence as the claim asserted under CERCLA.

This court has jurisdiction of this action pursuant to title 42, section 9613(b) of United States Code, title 28, section 1331 of the United States Code, and principles of supplemental jurisdiction.

Plaintiff Shyam Chetal sues Jared Blumenfeld as Administrator of the ENVIRONMENTAL PROTECTION AGENCY, REGION 9, pursuant to the citizen suit provision of the Clean Air Act, 42 U.S.C. § 7604(a)(2), to compel Defendant Lisa Jackson, in her official capacity as Administrator of the Environmental Protection Agency ("EPA"), to review and, if necessary, promulgate regulations "to prevent significant deterioration of air quality which would result from the emissions of" identified pollutants. 42 U.S.C. § 7476(a).  Plaintiff argues that because the statute creates a *non-discretionary* duty to review and promulgate such regulations, injunctive relief is proper.  42 U.S.C. § 7410(k)(1)(B)  for his numerous and repeated acts in failing to perform mandatory, i.e., nondiscretionary duties in that the actions of the City of Fremont, California and proposed final environmental impact statements made part of the administrative record of the city of Fremont violate the following Federal Statutes:

My petition did not seek intervention by the United States Environmental Protection Agency, under the exclusive jurisdiction of 42 U.S.C.A. § 9613(b), involving controversies arising under CERCLA without regard to the citizenship of the parties or the amount in controversy.

1. The Clean Air Act as more particularly detailed in this complaint pursuant to United States Code Aection in Title 42, § 7604 and U.S.C.S. § 304,

2. The Comprehensive Environmental Response, Compensation and Liability Act ("Superfund") and Title 42 U.S.C. § 104(e)(5)(B) and § 9604(e)(5)(b), and 42 USC § 310 and § 9659 including specifically all testing performed by the EPA on the Tesla Motor site located at 1440 Fremont Blvd., Fremont, California for the years 2007 through June 1, 2015.

3. The Federal Water Pollution Control Act, "Clean Water Act", Title 33 U.S.C. and Title 33 U.S.C. § 309, § 1319, § 504, § 1364 as well as § 505 and § 1365.

4. The Emergency Planning and Community Right-To-Know Act, Title 42 § 325(a) and § 11045(a) as well as § 325(b) and § 11045(b), facilities that store/use hazardous substances to notify SERC and/or LEPC; SERCs to notify EPA, § 302, § 11002(c), facilities to report releases of certain chemicals to state and local authorities [possible environmental justice issue: include any known or anticipated health risks; advice regarding medical attention necessary for exposed individuals] § 304, §313(h), § 11004, § 11023(h), facilities to submit MSDS for all hazardous chemicals managed on-site to state and local emergency officials, including fire departments (list of chemicals may suffice) § 311(a), (d), § 11021(a), (d), facilities to submit chemical inventory form to state and local emergency officials, including fire departments [possible environmental justice issue: average daily amounts of chemical on-site and location within facility; may include storage method] § 312, § 11022, facilities to submit to EPA and state officials toxic chemical release form for certain chemicals used in past year (forms due 7/1 of each year) § 313(a), (g), § 11023(a), (g), Request to SERC or LEPC for Tier II information on particular facility, § 312(e) (3), § 11022(e) (3)as it relates to the reports of toxic waste under and emanating from the

Tesla Motor Corporation plant in Fremont, California immediately adjacent and contiguous to the homes to be built by Lennar, Toll Brothers, and VALCO LLC of the California Proposed Warm Springs site in the city of Fremont, California.

The petitioner Shyam Chetal demands from the Environmental Protection Agency an independent investigation of the Environmental Impact Reports prepared by the City of Fremont and the defendants Lennar Corporation, Toll Brothers, and VALCO LLC Environmental Protection Agency Compliance Orders Civil Penalties under United States Code Section 42 § 325(a) and § 1104(a) to certify the Warm Springs Project as environmentally safe.

5.  The National Environmental Protection Act requires EIRs (Environmental Impact Reports) to be updated so that with the presence of multiple, significant environmental impacts, a final Environmental Assessment (EA) is prepared to determine whether or not the Administrator in Section 9, Mr. Jared Blumenfeld, will produce a report certifying after a complete review of a deficient Environmental Impact Statement (EIS) prepared through July, 2015 that there is a significant environmental impact dangerous to the subject site or preparation and filing that there is no significant environmental impact resulting in a finding by Jared Blumenfeld of no significant impact arising from the subject site under 40 C.F.R. § 1505.2, and petitioner further requests that this court enter an order against all defendants to certify that the Warm Springs Project as proposed does not violate any of the above Federal Statutes based upon a separate and independent investigation to be conducted by Jared Blumenfeld and to certify to this court in a final environmental report that the subject site is free of contaminants and environmental hazards pursuant to:

(A) EIS required for any "major federal action" [possible environmental justice issue: environmental justice concerns to be specifically identified and addressed – six principles listed in ceq 12-10-97 ej guidance ("major federal action" = policies, plans, programs, or projects)] (ceq 12-10-97 environmental justice guidance can be found at hhtp://ceq.eh.doe.gov/nepa/regs/ej/justice.pdf), § 102(2), ceq 12-10-97 ej guidance, 40 c.f.r. § 1500.1(c), § 4332(2), not applicable,

(B) Environmental Protection Agency  to review and comment on EISs prepared by other Federal agencies, and refer to ceq those actions which are "unsatisfactory" for public health and welfare or environment [possible environmental justice issue: EPA reviews whether appropriate data was analyzed and whether public adequately informed/involved; EPA to focus specifically on potential environmental justice issues], caa §309, §7609.

"As well as 42 U.S.C.A Sec 6972 (2), and 42 U.S.C SEC 9659, 42 U.S.C SEC 9613 (i), 42 U.S.C

SEC 9601 (Comprehensive Environmental Response, Compensation Liability Act, Tesla

Motors Pollution Waste/Air/On Petitioner/ Warm Springs Project)."

Lennar Homes and Toll Brothers as well as VALCO, LLC are national builders who have constructed residential and commercial properties in the state of California.

The Real Party in Interest, who is not a defendant in this action, is Tesla Motors, Inc. located at 1440 Fremont Boulevard, Fremont, California.  Tesla Motors has made innovative electric powered vehicles and occupying the former NUMI site where General Motors, followed by Toyota Motors made thousands of motor vehicles left behind the site tons of hazardous materials. **(EXHIBIT 2)**

Tesla Motors occupies this site and its founder, Mr. Musk, who has received over One Billion dollars in U.S. taxpayer funds, is now producing over 300 battery-powered cars a day ranging in price from $70,000.00 to $120,000.00 with a declared intent to produce over One Million electric cars in 5 years! (EXHIBIT 2) and (EXHIBIT 23)

Mayor Bill Harrison, has as Mayor of the City of Fremont, knowingly and intentionally approved and directed permits to be issued to the Defendants knowing the Plan violates EPA Standards.

The Warm Springs Project was designed by the other defendants to be a private "Magic Kingdom" for the support staff of Tesla Motors.

It is a stunning fact that neither the initial or final EIRs refer in any fashion to the past, present or future environmental hazards created by Tesla Motors independent of, or, in conjunction with, the defendant builders.

**THE RESULTING PROPOSED ENVIRONMENTAL ARMEGEDON REQUIRES JUDICIAL INTERVENTION. THE COUT OF FREMONTS OWN EXECUTIVE SUMMARY CONFIRMS EPA VIOLATIONS (EXHIBITS 3 AND 4)**

(EXHIBIT 25) prepared August 20, 2013 by Baseline Environmental Consulting of Emeryville, California of the Fremont Warm Springs Community Plan contains the following findings:

"10. FINDINGS

BASELINE has performed a Phase I ESA in conformance with the scope and limitations of the ASTM Standard Method E1527-05 for the proposed Warm Springs South Fremont Community Plan and EIR Project in Fremont, California.  Any

exceptions to, or deviations from, these standards are described in Section 9 of this report.  This Phase I ESA has identified the following known and potential sources of hazardous materials contamination that could impact soils and/or groundwater beneath the Project Area.:

- **Hazardous materials releases**

  A review of regulatory agency records indicates that there were 51 sites with documented soil and/or groundwater contamination located within or near Project Area (Figure 1; Table 3).  Nineteen of these sites are active cases.

- **Current and historical industrial and light industrial land use**

  A review of historical aerial photographs and topographic maps shows that the Project Area by 1961 (Table 1).  During the site reconnaissance it was observed that the Project Area contains primarily industrial a[2]nd light industrial land uses (Table 4).  Observations of the Project Area and its adjoining properties identified 119 sites with evidence of hazardous material use (Table 3).  Two hundred eighty-one sitesw were listed on hazardous materials transportation, use, storage, and/or disposal regulatory agency records.  The widespread current and historical use of hazardous materials on and surrounding the Project Area indicates that there is potential for undocumented hazardous materials releases to be present within the Project Area.

- **Current and historical agricultural land use**

---

[2] Quotes are taken directly from Exhibits.

A review of historical aerial photographs and topographic maps shows that the Project Area and the surrounding areas were being used for agriculture by 1939 (Table 1). Residues from historical and current pesticide and herbicide use could potentially be present in shallow soils within the Project Area. Historical pesticide use is of particular concern because arsenic from inorganic pesticides and residues from organ chlorine pesticides used in the past have the potential to persist for many decades in shallow soil.

- **Railroads**

The Union Pacific Rail Corridor runs approximately north to south across the Project Area (Figure 3). The railroad tracks have been present at the Project Area since at least 1939 (Table 1). Chemicals associated with historical railroad operations are commonly found along railroad right-of-ways. The most frequently reported contaminants are metals, including arsenic, pesticides, PCBs, and constituents of petroleum hydrocarbons.

- **Pipelines**

Two underground petroleum, pipelines are located along the Union Pacific Rail Corridor right-of-way adjacent to the Tesla Factory (Figure 3). One pipeline, operated by Chevron Pipe Line Company, turns east along South Grimmer Boulevard. The other pipeline, operated by Santa Fe Pacific Pipeline, L.P., continues to run along the Union Pacific Rail Corridor right-of-way. Contaminants of concern from petroleum pipelines include gasoline, diesel, and jet fuel, as well as BTEX and PAHs.

- **Aerially-Deposited Lead**

    Exposed shallow soils in the Project Area within approximately 30 feet of the
    edge of major roadways, including I-880 and I-680, could be contaminated
    with ADL from historical vehicle emissions.

- **Hazardous materials in structures and transformers**

    Based on the age of buildings in the Project Area, asbestos-containing
    material and lead-based paint may be present. Transformers containing PCBs
    may also be present. The disturbance of these structures and transformers as a
    result of future development could release hazardous materials during
    construction activities, which could pose a risk to human health and the
    environmental during Project activit[3]ies."

**"11. CONCLUSIONS OF DOCUMENTS**

We have performed this Phase I ESA in conformance with the scope and limitations
of the ASTM Standard Method E1527-05 for the Project Area. Any exceptions to, or
deviations from, this practice are described in Section 9 of this report. This
assessment has revealed the following RECs and related environmental concerns in
connection with the Project Area:

- Site with documented soil and/or groundwater contamination located
    throughout the Project Area;
- Current and historical industrial and light industrial land use associated with
    the use of a wide variety of hazardous materials;

---

[3] Quotes are taken directly from Exhibits.

COMPLAINT                                                                         12

- Railroad right-of-ways which may be associated with releases of metals such as arsenic, pesticides, PCBs, and petroleum hydrocarbons;

- Petroleum pipelines which may be associated with releases of petroleum products, as well as BTEX and PAHs;

- Pesticide and herbicide residues in shallow soils from current and historical agricultural uses, including arsenic from inorganic pesticides and organochlorine pesticides;

- ADL exposed shallow soils adjacent to the I-880 and I-680 highways from historical vehicle emissions; and

- Lead-based paint and asbestos-containing materials in existing structures and transformers containing PCBs."

## "12. RECOMMENDATIONS

Due to the potential presence of hazardous materials releases from current and historical land uses, as well as the documented releases of hazardous materials in and near the Project Area , a parcel-specific Phase I site assessment should be conducted prior to the redevelopment of any of the parcels within the Project Area. The parcel-specific Phase I assessment should relay on the research and findings of this Phase I site assessment to the extent practical.  Based on the findings of the parcel-specific Phase I site assessment and proposed future land uses of the parcel, additional investigation, including soil, groundwater, and/or soil gas sampling, may be warranted."

## CONCLUSION

This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§1331, 1343 as a case arising under the laws of the United States. To require the EPA to immediately enjoin the Defendants from proceeding with the Warm Springs Project until the EPA Certifies the Warm Springs Project is safe and Tesla Motors is compliant with IB Permit that Expired on June 2015 **(EXHIBIT 2)**

### III. NOTICE

On 8/14/2014 Petitioner Mailed to Bill Harrison, Mayor of the City of Fremont intention to file suit against the Defendants for Violations of the Environmental Protection Act, with copies to the Federal Bureau of Investigation. Petitioner believed that copies were then passes to the Environmental Protection Agency.

On 6/9/2015, a Second Notice was again forwarded to the Environmental Protection Agency in Washington D.C., San Francisco, and Federal Bureau of Investigation with 21 Exhibits. EPA has not remedied these Violations, therefore a present and actual controversy exists.

### IV. VENUE

Defendant EPA resides in this judicial district. EPA Region 9, which has authority over California, is headquartered in San Francisco. This civil action is brought against an officer of the United States acting in her official capacity and a substantial part of the events or omissions giving rise to the claims in this case, in Fremont, Alameda County in the Northern District of California. Therefore, venue is proper in this Court pursuant to 28 U.S.C. § 1391 (e).

## V. INTRADISTRICT ASSIGNMENT

All of the events and omissions giving rise to the claims in this case occurred in the

County of Alameda, EPA Region 9, which has authority over California, is headquartered in San

Francisco. Accordingly, assignment to the Oakland Division is proper pursuant to Civil L.R. 3-2

(c) and (d).

## VI. PARTIES

### PETITIONER SHYAM CHETAL – ALLEGATION OF INJURIES

This Petitioner Shyam Chetal, at age 74, is in poor health with over Five Heart Stents due to the

Environmental Pollution from the Tesla Motor Site, N.U.M.I at 4550 Fremont Boulevard,

Fremont, California. My office is less than 500 feet from portions of the Boundaries of the Tesla

Plant, and about 1,000 Feet from the borders of the Lennar Site. I have lived in Fremont over

Forty years and Forty Years as a Registered Civil Engineer and Real Estate Broker. My office is

located at 2090 Warm Springs Court, Fremont, California 94539. Mayor Bill Harrison has

directed, approved and fortified permits knowing full well that Final E.I.R.'s Emit Dangerous

Health and Safety Hazards, that have in the past, presently, and future violate Standards of Air,

Water, Underground Pollutant Hazards of the Environmental Protection Act. I have stand to see

the Defendants as I have been injured—Heart Attacks—from Tesla Fumes, an injury in fact,

which is directly connected to the Violations of the Tesla Plant, under EPA, which will certainly

kill or cripple me if the EPA does not investigate and stop the Warm Springs Project, and my

injury will be redressed by an injunction from this Court to enjoin the Defendants from starting

construction by injunction requiring Certification by the EPA that all mitigation measures have

been satisfied and Tesla Motors is immediately enjoined by EPA to fully comply with its review Permit of 10/8/2010 which has expired. (EXHIBIT 2) (42 U.S.C.A. 6972 (A)

Defendants  Jarend Blumenfeld in his official capacity as Director of Environmental Protection Agency, Region 9, San Francisco, California, Matthew Rodrigues in his official capacity as Secretary for the California Environmental Protection Agency, Muntu Davis in his official capacity as Director of the Alameda County, State of California, Public Health Department, City of Fremont Community Development Department—Planning Division, Bill Harrison, Mayor, City of Fremont and the City of Fremont Community Development Department, Lennar Homes, A Florida Corporation, Toll Brothers, A New York Corporation, Valco LLC, A California Corporation, and does 1-100, are and at all times relevant to this complaint, all other Government Agency Defendants have violated E.P.A Standards and must be enjoined.

## VII. FACTUAL ALLEGATIONS

### A. THE PROPERTY AND SITE

The Community Plan Development is at a property known as the Warm Springs South Fremont Community Plan (State Clearinghouse No. 2013032062) located in the City of Fremont, Alameda County, California.  The 879-acre plan is generally bounded by Interstate 880 (I-880) (west); Auto Mall Parkway (north); Interstate 680 (I-680)(east); and Mission Boulevard (State Route 262)(south).  The plan area is located on the Niles and Milpitas, California, United States Geological Survey 7.5-minute topographic quadrangle maps, Township 5 South, Range 1 West, Sections 11 and 14 (Latitude 37°30' 16" North; Longitude 121°56' 10" West) (hereinafter the "PROJECT"), including information indicating that traces

COMPLAINT

of the active San Andreas Fault bisect the property, and further including suppression from the EIR of the California Department of Conservation, State Geological Survey's 2010 Fault Activity Map, which indicates the presence of the active San Andreas Fault running directly the Lennar and Toll Brothers' property.

B. THE WARM SPRINGS PROJECT

As of February 23, 2015, Lennar Corporation completed a deal to buy a 111-acre chunk of a former car-manufacturing plant in Fremont, 30 miles southeast of San Francisco, where it plans a dense mix of 2,200 apartments and houses, research-and-development space and offices, all centered around a new station for the commuter rail that leads to San Francisco.

PHYSICAL DESCRIPTION AND MAP OF THE WARM SPRINGS PROJECT INVOLVING THE DEFENDANTS CITY OF FREMONT, LENNAR CORPORATION, TOLL BROTHERS, AND VALCO LLC **(EXHIBIT 1 AND 21)**

NATIONAL ENVIRONMENTAL POLICY ACT (NEPA) APPROVAL OF THE BAY AREA RAPID TRANSIT DISTRICT WARM SPRINGS EXTENSION PROJECT FREMONT, CALIFORNIA

The U.S. Department of Transportation, Federal Transit Administration (FTA), has determined that the requirements of the National Environmental Policy Act of 1969 (NEPA) have been satisfied for the San Francisco Bay Area Rapid Transit District (BART) Warm Springs Extension Project (WSX Project) in Fremont, California. The WSX Project consists of the design, construction, and future operation of an extension of the system 5.4-miles from its current terminus in central Fremont to a new station in the Warm Springs district in southern Fremont. An optional station at Irvington is also being considered if funding for the station is secured by the City of Fremont.

The WSX Project was adopted by the BART Board of Directors on June 26, 2003 as a state-funded project, following evaluation of environmental impacts pursuant to the California Environmental Quality Act (CEQA). Subsequent changes in state transportation

funding priorities caused BART to seek funding for the WSX Project from sources subject to NEPA and other federal requirements.  FTA and BART, as joint lead agencies, prepared a Final Environmental Impact Statement (FEIS) for the WSX Project.  The Notice of Availability for the FEIS was issued on July 14, 2006 (*Federal Register*, Vo. 71, No. 135). The FEIS also satisfied the requirements of other environmental laws that apply to federal actions, such as Section 4(f) of the Department of Transportation Act (49 U.S.C. Section 303), Section 6(f) of the Land and Water Conservation Fund (LWCF), and Section 106 of the National Historic Preservation (NHPA). **(EXHIBIT 27)**

The move by Lennar, along with a handful of developers that have bought smaller parcels nearby, **environmentally unserved pollution filled building boon,** appears to be a bet that the former manufacturing area can be transformed into a thriving downtown-like environment that feeds in part off the expansion of Tesla Motors, which owns a factory adjacent to Lennar's **(EXHIBIT 27)**

The City of Fremont gave final approval to Lennar Corporation to commence the project on March 18, 2015 **(EXHIBIT 16)**

On May 1, 2015, Lennar Corporation announced an 879-acre area centered on the Tesla plant that the city zoned last year for a mix of residential, office, industrial and retail uses.  If Lennar's project is approved, building it out is expected to take 10 to 15 years!!
**(EXHIBIT 15)**

Petitioner SHYAM CHETAL petitions the Court to take Judicial Notice pursuant to Federal Code of Evidence 201 (b)(2) the following newspaper articles that underscore the abject failure of Ms. Gina McCarthey and Mr. Blumenfeld to properly perform and file a truthful final impact report. SEE *Von Saher v. Norton Simon Museum Pasadena*, 593 F3d 954 (9th Cir. 2010). Approval of the Site Plan as Environmentally Safe is "Inherently" Incredible.

*AGosto v. INS* 436 U.S. 748 (1978).

An Environmental Disaster has resulted from the failure of the Environmental Protection Agency, District IX, to investigate and prevent Violations of EPA Multiple Laws resulting in Gridlock on the Federally regulated Bay Area Rapid Transit (BART) at the Fremont/Warm Springs Project and Interstate 680 at Warm Springs, Fremont, California.

The Fremont Master Plan prepared in 2012 for the Warm Springs Project is outdated, has not bee updated and has already created massive gridlock of Motor Vehicle Traffic on Interstate 680, as well as, the Bay Area Rapid Transit District resulting in total inability of individual commuting to or living in the Warm Springs Project to live and work in an Environmentally Safe Area.

The Defendants Jared Blumenfeld in his Official Capacity as Director of Environmental Protection Agency, Region 9, San Francisco, California, and Matthew Rodrigues in his official capacity as Secretary for the California Environmental Protection Agency, and Mr. Muntu Davis in his Official Capacity as Director of the Alameda County, State of California, Public Health Department, ignored and failed in their representative capacity to conduct Environmental testing at the Warm Springs Fremont California site described above both prior to and after the initial City of Fremont reports prepared by First Carbon Solutions of Walnut Creek, California to immediately and independently stop the City of Fremont—Warm Springs/South Fremont Community Plan immediately after the distribution of the draft EIR. Among the multiple alarming separate reports from First Carbon Solutions included the Section 3.6—Hazards and Hazardous Materials Report which did alert further independent testing but which was not done with actual notice given of the Environmental Hazards.

The Pertinent Sections of Section 3.6—Hazards and Hazardous Materials—Are outline

below and which require Judicial Intervention through a temporary restraining order to prevent

any construction by the defendants which are Toll Brothers and Valco LLC until the

Environmental Protection Agency State of California Department of Environmental Protection

and the Alameda County Department of Health certify that the Warm Springs/South Fremont

Community Plan Hazards have been corrected. **(EXHIBIT 5)**

As an example, there is absolutely no subsequent report from First Carbon Solutions that

mitigation measures have in face been accomplished. The Following Exhibits Confirm EPA

Violations. **(EXHIBIT 4,5,7,8,9,20, and 21)**

**"3.6 – Hazards and Hazardous Materials**

The California Health and Safety Code defines a hazardous material as ".. . any material

that, because of its quantity, concentration, or physical or chemical characteristics, poses a

significant present or potential hazard to human health and safety, or to the environment.

Hazardous materials include, but are not limited to, hazardous substances, hazardous wastes,

radioactive materials, and any material which a handler or the administering agency has a

reasonable basis for believing that it would be injurious to the health and safety of persons or

harmful to the environment if released into the workplace or the environment" (Health and

Safety Code, Section 255012)."

**"3.6.1 – Introduction**

This section describes hazards and hazardous materials within the vicinity of the Warm

Springs/South Fremont Community Plan area that could pose a significant threat to human

health or the environment.  The impacts and mitigation measures section defines the criteria of

significance and identifies potential impacts and mitigation measures related to hazards and

hazardous materials for future development."[4]

**"3.62 – Environmental Setting**

**Hazardous Materials**

Products as diverse as gasoline, paint, solvents, household cleaning products, refrigerants, and radioactive substances are categorized as hazardous materials. The proper management of hazardous materials is a common concern for all communities. Beginning in the 1970s, governments at the federal, state, and local levels became increasingly concerned about the effects of hazardous materials on human health and the environment. Numerous laws and regulations were developed to investigate and mitigate these effects. As a result, the storage, use, generation, transport, and disposal of hazardous materials are highly regulated by federal, state, and local laws and regulations."

**"Hazardous Materials User Study**

The City of Fremont retained TRC Solutions, Inc. to conduct a Hazardous Materials User Study for the plan area. The purpose of this assessment was to analyze potential constraints and impacts to siting new sensitive receptors I n an existing industrial area from the presence of hazardous materials being used and/or transported."

**"3.6-1: Key Hazardous Materials Users/Facility Summary**

Liquid Propane, Anhydrous Ammonia, Nitric Acid; Hydrocyanic Acid, Liquid Hydrogen, Chlorine Anhydrous Ammonia; Silane, Methanol, Natural Gas, Gasoline, Aviation Fuel.

Worst-case release scenario modeling indicated that there is a potential for releases that could pose a health and safety risk to future sensitive receptors within the plan area. A "threat radius" was identified for each of the 11 sources for each type of potential hazardous materials

---

[4] Quotes are taken directly from Exhibits.

incident; they ranged from 219 feet for the Western Digital facility at 44100 Osgood Road to greater than one mile at the Glacier Ice Company at 43960 Fremont Boulevard. Absent mitigation, development within these distances of the sources could expose persons to a potential hazardous materials upset. The threat radii for the pipelines ranged from 317 to 858 feet; as pipelines traverse the plan area from north to south, worst-case releases from the pipelines could potentially affect parcels within a significant portion of the plan area."

**Table 3.6-2: Sites in Regulatory Agency Files and Databases**

| Type of Site | Number of Sites in Plan Area | Number of Sites in Surrounding Areas |
|---|---|---|
| Sites that use, transport, store, and/or dispose of hazardous materials | 205 | 181 |
| Sites reporting a one-time hazardous materials accident | 14 | 4 |
| Sites reporting a hazardous materials release requiring regulatory agency oversight for investigation and/or remediation | 14 | 36 |
| Sites on other regulatory agency hazardous materials databases | | |

**"3.64 – Thresholds of Significance;**

3.65 – Project Impacts and Mitigation Measures;

**Routine Transport, Use, or Disposal of Hazardous Materials;**

*Mitigation Measures*

**Impact Analysis;**

*Level of Significance Before Mitigation*

**Exposure of Schools to Hazardous Materials or Emissions;**

Impact HAZ-3:  Buildout of the Community Plan would not expose students and teachers at the proposed new school to hazardous materials or emissions

*Impact Analysis*

Impact HAZ-4:  Buildout of the Community Plan may expose future construction workers, residents, and other users to hazardous materials from listed hazardous material sites."

**PETITIONER SHYAM CHETAL REQUESTS THAT THIS COURT TAKE JUDICIAL NOTICE NEWS PAPER ARTICLES DESCRIBING EPA VIOLATIONS BY DEFENDANTS LENNAR, TOLL BROTHERS, VALCO AND TESLA. ATTACHED EXHIBITS. SEE Von Saher v Norton Simon Museum of Pasadena, 593 F3d 954, (9th Cir. 2010).**

1.  **EXCLUSIVE: TESLA SNAPS UP FORMER SOLYNDRA BUILDING IN HUGE FREMONT EXPANSION (JUNE 11, 2015), NATHAN DONATO-WEINSTEIN, *SILICON VALLEY BUSINESS JOURNAL* (EXHIBITS 2, 23)**

Tesla Motors Inc.'s "Gigafactory" under construction near Reno might get all the press, but the electric carmaker is also expanding closer to home, and in a big way. Palo Alto-based Tesla this month signed a lease to occupy a capacious manufacturing building a few minutes away from its existing car plant in Fremont, the company confirmed to the Business Journal on Wednesday.

At more than 500,000 square feet, the deal for the Page Technology Center at 901 Page Ave. represents Tesla's largest growth spurt in Silicon Valley since buying the former NUMMI plant in 2010. And it also closes the book on a chapter in Silicon Valley tech history, absorbing the last remaining vacancy related to the implosion of solar panel-maker Solyndra in 2011.

"901 Page, located conveniently down the road from the Tesla Factory, gives us the space to expand our manufacturing and build more engineering labs as we build up production," Tesla said in an email.

It's unclear how many people could work there, and when Tesla would start occupying the building. But city officials welcomed the news this week. For a short time, the cavernous building—which brokerage JLL marketed with the slogan "Think Big"—is where Solyndra solar tubes once rolled off final assembly lines. But it's been empty ever since the cleantech startup went spectacularly bust.

"The absorption of 901 Page would not mean normalization of the city's vacancy rates, but also reaffirms Fremont's strength in the region for advanced manufacturing with all the former Solyndra facilities now transitioned to other Silicon Valley advanced industry heavyweights," said Christina Briggs, economic development manager for the city of Fremont.

**REVVING UP**

The deal comes as Tesla preps to start deliveries of its next model—the Model X crossover—in three to four months, CEO, Elon Musk said at Tuesday's annual shareholder meeting. The relatively affordable $35,000 Model 3 is targeted for 2017. "It seems like we'll be able to maintain roughly 50 percent average (sales) growth rate per year for several years to come," Musk said during the meeting, held at Computer History Museum in Mountain View, according to the International Business Times. That suggests Tesla would deliver 55,000 cars this year and 82,500 in 2016, IBT said.

Tesla expects to sell 500,000 cars a year by 2020—an enormous increase over today's sales figures.

Trip Chowdhry, co-founder of Global Equities Research LLC, told me that he's bullish on the company's prospects.

"The production of the Model S has significantly improved," he said. "There were some hiccups. That's all gone away. As of today it looks like they will meet their targets."

## BAY AREA GROWTH (EXHIBITS 2, 23)[5]

While most attention has been focused on Tesla's enormous, 10-million-square-foot battery factory—the so-called "Gigafactory"—the company has been steadily growing in California, too. Tesla told the LA Times this week, as criticism swirled over its use of government incentives, that it's now the largest manufacturing employer in the state, with some 9,000 employees.

> **Observers said the company's existing facilities are packed.**
> **"If you are in Palo Alto office, there is no parking. The whole thing is jam-packed with cars," Chowdry said. "Same with NUMMI," he said, referring to the Fremont factory by its former owner's name. "Parking is just not there." He speculated that the new facility could be ideal for Tesla to bring some of its prototyping and R&D currently done at its Palo Alto headquarters closer to the plant.**
> **"What you need is proximity to the factory," he said.**

The Page Avenue building is the largest Tesla expansion in Northern California since the company leased a 431,000-square-foot former Chrysler assembly plant in Lathrop last year, where it is doing computer-assisted machining. In May, Tesla added on, leasing a 271,075-square-foot industrial building just behind that plant at 401-501 Nestle Way. The latter deal has not been widely reported.

---

[5] Quotes are taken directly from Exhibits.

But Tesla has also been active locally, snapping up a 300,000-square-foot-building under construction at 47400 Kato Road in Fremont.  It also bought a former United Auto Workers union hall—on four acres of land—last December.

Tesla and other industrial tenants have been growing rapidly in Fremont, driving down the city's industrial vacancy rate to 2.1 percent after factoring in the 901 Page Ave. deal, said Cushman & Wakefield Senior Analyst Sethena Leiker.  That's down from 5 percent at the end of the first quarter.

Tesla's new building is located directly behind another former Solyndra building at 47700 Kato Road, which earlier this year was leased by SolarCity.  That's Tesla's "cousin company"—so called because it led by Tesla CEO Elon Musk's cousins. Musk is also the chairman of SolarCity.

"Fremont has really reinvented itself with different kinds of manufacturing tenants," said Ed Del Beccaro, managing director for real estate services firm Transwestern in the East Bay and Silicon Valley.  "Milpitas, Fremont, Newark—those three cities are the northern tip of Silicon Valley.  This is where they make stuff.  That helps the whole Bay Area region go forward.  I think the next step is you'll see people build buildings, because space is gone."

In occupying 901 Page, Tesla enters a building that has housed some major names in Silicon Valley tech history.  Built in 1982, Xerox, Tandem and Hewlett-Packard all called it home.  In 2008, shortly before Hewlett-Packard left, the facility was acquired by developer Overton Moore.  In late 2009, Overton signed a 12-year, $45-million lease with Solyndra—then a hot up-and-coming clean-tech startup.  A year later, Overton sold the facility to San Francisco-based investment firm Stockbridge Capital. But less than a year after that, Solyndra filed for bankruptcy and the facility went dark.

The facility includes 325,000 square feet of manufacturing, warehouse or distribution space and 182,000 square feet of office, lab and cafeteria space.

The Tesla lease removes one more large option for area companies in the hunt for large blocks of industrial space.  That's likely good news for developers such as Prologis, <u>which is building a logistics complex</u> to total more than 620,000 square feet on Boyce Road in Fremont.

In the Page Technology Center transaction, both sides were represented by real estate services firm JLL.  JLL's Mark Bodie headed up the landlord leasing team and declined to comment this week. **(EXHIBITS 2, 23)**

2.  **[DEFENDANT LENNAR BUILDERS—WARMSPRINGS BUILDER]**
**"LENNAR'S <u>MASSIVE</u> FREMONT DEVELOPMENT REACHING CRUCIAL**
**MILESTONE," (<u>FEBRUARY 23, 2015</u>), NATHAN DONATO-WEINSTEIN, *SILICON***
***VALLEY BUSINESS JOURNAL* (EXHIBIT16)**

Take a look at the land just north of the Tesla Motors Inc. plant in Fremont, and it's clear there's a lot of opportunity for development:  A new BART station is rapidly reaching completion nearby, and wide swaths of [6]bare land are practically drying out for homes and offices.

Well, you won't have to wait too long to see rooftops start sprouting up.  A transformational "master plan" from homebuilder Lennar is heading for its most important public hearings in the weeks ahead.  That could pave the way for more than 2,200 housing units and 1.4 million square feet of commercial space in a decidedly urban context.

I've written about the proposal in broad strokes in the past, but documents submitted to the city provide a clearer picture of Lennar's plans, including an outline of density near the new

---

[6] Quotes are taken directly from Exhibits.

Warm Springs BART station.

At roughly 111 acres, the Lennar project is the largest being contemplated in the city's new Warm Springs "innovation district" – an 879-acre area centered on the Tesla plant that the city zoned last year for a mix of residential, office, industrial and retail uses. If Lennar's project is approved, building it out is expected to take 10 to 15 years!!

Fremont's planning commission will review Lennar's master plan on Thursday, and the city council is expected to consider entering into a development agreement on March 3.

"For us, the development agreement is an agreement between the developer and the city, which gives us certainty that certain priorities the community has will be met in a timely fashion," said Assistant City Manager Jessica Von Borck.

That includes paying for a new school (in partnership with other developers), installing new street and utility infrastructure – crucially – setting the stage for nearby commercial development.

"Lennar's been a great partner; they understand what the vision is; they are meeting all the priorities," Von Borck said.

A Lennar spokesman declined to comment.

Lennar, which is in contract to purchase the property from Union Pacific, is not alone in developing this area. Toll Brothers and Valley Oak Partners are also working on nearby sites.

But Lennar's project is the largest – it will eat up more than half of the roughly 4,000-unit residential allocation contained in the Warm Springs plan. And it is being closely watched, given the potential for it to bring thousands of new jobs and residents to the area around a new BART station. Planners say the development focus is necessary to deal with the region's crippling traffic. Other BART stations on the extension path – in Milpitas and San Jose – are

also seeing development pick up. **(EXHIBIT 16)**

Lennar won't build the commercial component – it will simply provide the utility infrastructure and site preparation – but officials say the investment at roughly $35 million makes it much more marketable for either ow[7]ner-users or developers to come in and build.

In scale, the closest comparable project is KB Home's massive Communications Hill development, which similarly has a huge industrial component that KB is prepping for another developer/company to come in and bite off.

Here are some quick tidbits from the city's staff report and master plan on February 23, 2015, *Silicon Valley Business Journal*:

1. **What gets built?** Lennar is splitting the residential component among for-sale, rental and affordable units – 2,214 in all. Lennar would prepare part of the site for industrial, office and R&D use (up to 1.4 million square feet worth) but would not build this itself.

2. **How much is rental and what is for-sale?** A staff report says that 1,256 units would be rental, so that means that about 960 would be for-sale.

THE CITY OF FREMONT EXPERT REPORT IN SUPPORT OF THE PROJECT IGNORING "INHERENT INCREDIBILITY" OF ENVIRONMENTAL SAFETY RISK, THEIR EXPERT ON THIS POINT STATES:

3. **Affordability:** About 13 percent of rental units (or 286 units) would be considered "affordable."

THE CITY OF FREMONT EXPERT REPORT IN SUPPORT OF THE PROJECT IGNORING "INHERENT INCREDIBILITY" OF ENVIRONMENTAL SAFETY RISK, THEIR EXPERT ON THIS POINT STATES:

---

[7] Quotes are taken directly from Exhibits.

**4. How dense is the housing?**  It depends.  About 38 acres of the residential land (located within a half mile of BART) would be at a density of more than 30 units per acre.  About 25 acres (located within ¼ mile of BART) would be built in a mixed-use context at more than 50 units per acre.  About four acres are slated for a park, with another 5 acres dedicated for a school.

THE CITY OF FREMONT EXPERT REPORT IN SUPPORT OF THE PROJECT IGNORING "INHERENT INCREDIBILITY" OF ENVIRONMENTAL SAFETY RISK, THEIR EXPERT ON THIS POINT STATES:

**5. What exactly is up with the commercial space?**  The development plan calls for about 700,000 square feet of Class A office space (with ground-floor retail) located on a street called "Innovation Way," which is envisioned as a key mixed-use urban corridor.  Another 700,000 square feet of R&D space would be developed just south of Innovation Way.  (It will be interesting to gauge the market's reaction to this much office/R&D capacity – but more on that in another story).

THE CITY OF FREMONT EXPERT REPORT IN SUPPORT OF THE PROJECT IGNORING "INHERENT INCREDIBILITY" OF ENVIRONMENTAL SAFETY RISK, THEIR EXPERT ON THIS POINT STATES:

**6. Phasing.**  Lennar is committing to doing the project in four phases.  The entire backbone infrastructure would take place in Phase 1, going through 2017.  Phase 2 would see construction of the affordable rental complex, a K-5 elementary school, a park, urban plazas and some multi-family units.  Phase 3 would be additional multi-family units.  And  Phase 4 would be to complete the balance of the units.

"We anticipate it would be about 24 month buildout to do all the backbone improvements,"

Van Borck said. "It's quite a big task."

THE CITY OF FREMONT EXPERT REPORT IN SUPPORT OF THE PROJECT IGNORING "INHERENT INCREDIBILITY" OF ENVIRONMENTAL SAFETY RISK, THEIR EXPERT ON THIS POINT STATES:

**7.   What's it going to look like?**  Lennar's master plan does not include actual renderings.  That will come during a later approval phase of specific plans.  But it does show "look book" – style reference images, and the aesthetic is decidedly modern.  They will run the gamut from three- to four-story stacked flat or podium buildings (in the urban residential zone) or four stories and up "wrap" or podium-style buildings in the "urban mixed-use" zone.  In other words, it doesn't sound like the area will see much, if any, single-family detached product.

I hope to have more on Lennar and the other nearby projects in a future story.

In the meantime, check out Lennar's master plan for yourself and let me know what you think in an email or on Twitter.

THE CITY OF FREMONT EXPERT REPORT IN SUPPORT OF THE PROJECT IGNORING "INHERENT INCREDIBILITY" OF ENVIRONMENTAL SAFETY RISK, THEIR EXPERT ON THIS POINT STATES:

**3.   [DEFENDANT TOLL BROTHERS]**

**TOLL BROTHERS AIMS FOR 1,000 UNITS NEAR BART STATION, APRIL 17, 2015, NATHAN DONATO-WEINSTEIN, *SILICON VALLEY BUSINESS JOURNAL***

During the dot-com boom, the 34-acre Fremont site sandwiched between Interstate 680 and Warm Springs Boulevard was destined for a large R&D complex.  But the boom was

COMPLAINT                                                                                                          31

followed by bust, and for the next 15 years the land sat fallow.

It probably won't for much longer. Toll Brothers, the huge, publicly traded homebuilder, is moving forward with plans for up to 1,000 units there in a range of product types – from rental units to for-sale condos. It's Toll's most significant project in the region, yet it has flown mostly under the radar as attention has focused on Lennar Corporation's massive project next door.

Both of them are the most visible evidence of a develop[8]ment boom in the city's Warm Springs Station area – aka, the neighborhood home to the Tesla factory – centered on an under-construction BART station.

The city approved a plan two years ago to jump-start dense development there to build off transit, and Toll's master plan, submitted in March, shows it's working, said Jeff Schwob, the city's community development director.

"They understand the plan and are committed to it," he said.

Toll couldn't get any closer to transit – the Warm Springs BART station is being built across Warm Springs Boulevard.

Toll's attachment to the site is interesting because the company is mostly known in the Bay Area as a builder of large, single-family luxury homes – not transit-oriented development. Its master plan for Fremont, however, shows a density mix that ranges from 90 units per acre at one site across the street from the station; Toll's average is about 70 overall.

"One thing that is very interesting about Toll is they've committed to these different prototypes of housing and they all have an urban feel to them," Schwob said. "You won't see vertical cracker boxes. As a whole, the buildings have a more contemporary design."

---

[8] Quotes are taken directly from Exhibits.

Toll is in contract to purchase the land from an investment group that includes San Jose-based Westwood Company.

It's just the latest twist in the land's development trajectory. In 2000, Asyst Technologies announced plans for a 600,000-square-foot office park there, in a joint venture with Trumark Commercial; the next year, after the dot-com collapse, Asyst put those plans on ice. It declared bankruptcy in 2009.

Toll's master plan would not include significant office or retail space, but it would provide a 1.2 acre "central park" and 0.7-acre "urban plaza." The mix of product types includes buildings ranging from three to four stories arranged in a grid network. Most parking would be underground or in structures tucked inside the buildings. Toll plans to build out the project in three phases; an affordable component with up to 145 units is also contemplated.

It joins Lennar's proposed 2,000-unit complex on land it is buying from Union Pacific just north of the Tesla Motors Inc. plant. That project received final approvals last month.

Toll's project could be approved this year; it's unclear when the company could start to build and whether it would seek development partners.


## 4. [DEFENDANT LENNAR CORPORATION]

## LENNAR CLOSES ON UNION PACIFIC LAND IN FREMONT, MAY 1, 2015, NATHAN DONATO-WEINSTEIN, *SILICON VALLEY BUSINESS JOURNAL*

It's official: Lennar Corporation has bitten off a huge chunk of dirt in Fremont from Union Pacific as it prepares to start work on a transformational development next to the city's under-construction BART station.

The huge homebuilder closed on the 111-acre site just north of the Tesla Motors Inc. plant

on Friday, city officials said.  We'd love to know what the price was, but that information
wasn't immediately available.

"This deal is a direct result of public-private partnerships between UP, Lennar and the city
working together," Fremont Mayor Bill  Harrison said in a news release.

We've been reporting on this deal for over a year, most recently when Lennar received its
final approvals for the project in March.  The project includes 2,214 residential units
(including 286 affordable), 700,000 square feet of Class A office space and 700,000 square
feet of R&D space.

Lennar will not build the commercial space, but has committed to invest in the
infrastructure that will make the commercial development sites viable.

This is one of several huge projects coming[9] down the pike in Fremont's new Warm
Springs "innovation district."  I detailed Toll Brothers plans in our special Business of
Residential Real Estate issue last month.

CBRE's Bob Steinbock and Joe Moriarty represented the seller.

We'll have more on Warm Springs in the weeks ahead.

## 5.  LENNAR BETS ON SILICON VALLEY'S SPREAD, MAY 5, 2015, BY ELIOT BROWN

With office and residential space in San Francisco and Silicon Valley becoming scarcer by
the day, the East Bay city of Fremont, California, is girding for some spillover.

Last week, Lennar Corp. completed a deal to buy a 111-acre chunk of a former car-
manufacturing plant in Fremont, 30 miles southeast of San Francisco, where it plans a dense
mix of 2,200 apartments and houses, research-and-development space and offices, all centered

---

[9] Quotes are taken directly from Exhibits.

around a new station for the commuter rail that leads to San Francisco.

The move by Lennar, along with a handful of other developers that have bought smaller parcels nearby, appears to be a bet that the former manufacturing area can be transformed into a thriving downtown-like environment that feeds in part off the expansion of Tesla Motors, which owns a factory adjacent to Lennar's parcel.

"This is a highly desirable site," said Gordon Jones, Lennar's Bay Area division president. "It's in a constrained housing market in proximity to well-paying jobs and easy access transit."

The plans in Fremont show how communities and investors throughout the Bay Area are trying to capitalize on the rapid growth that has so far been concentrated in San Francisco cities and cities to the south in Silicon Valley. With traffic and other congestion concerns mounting in those communities, cities in the East Bay have high hopes.

**Find your new home now ...**

"We're looking forward to seeing some of that growth come to this side of the bay," said Jessica von Borck, Fremont's assistant city manager.

Other East Bay cities are seeing new development as well. The University of California, Berkeley is planning a campus with some private investment in the suburb of Richmond, in the northern reaches of the East Bay. In San Ramon to the east, the owner of the giant office park Bishop Ranch is planning a large, dense mixed-use expansion.

And in Santa Clara, in the southern reaches of Silicon Valley, Related Cos. Is planning a multibillion-dollar mixed-use development meant to attract expanding companies looking for modern office space.

Of course, it is far from clear that lots of businesses will flock to any of these developments, let alone all of them. Despite the growth of the tech sector, the East Bay has

long struggled to attract top businesses to expand or move, and historically it has more been a hub of back-office jobs and manufacturing, due in part to its distance from wealthy suburbs north and south of San Francisco.

In addition, the entire Bay Area is known for its booms and busts, and today's boom surely isn't going to continue forever.

For Fremont, the deal by Lennar represents the culmination of a planning effort and push that started in 2010, after a giant auto plant jointly owned by Toyota Motor Corporation and General Motors Company closed.

The car makers sold part of the facility to Tesla, and then sold a parcel to railroad Union Pacific Corporation, which planned to use it as a rail yard.

But that vision was at odds with that of city pl[10]anners, who saw the plant's closure as an opportunity to bring new developments and attract new employers.

So a set of city officials flew out to Omaha, Nebraska, to lobby the chief executive of Union Pacific on their vision, Ms. Von Borck said. The land could be more valuable with other uses, the officials said, particularly given that the Bay Area Rapid Transit rail was being extended and Tesla's popularity was growing.

Shortly thereafter, Union Pacific shifted course and put the land up for sale, settling on Lennar as a buyer. Lennar then crafted a plan, received city approvals and completed the deal last week. The price wasn't disclosed but Union Pacific said in a statement it would recognize a gain of $110 million on the deal.

For Lennar, the purchase adds to its portfolio of large-scale projects in the Bay Area.

It is seeking to build two giant housing developments in San Francisco—one on an island

---

[10] Quotes are taken directly from Exhibits.

COMPLAINT

between San Francisco and Oakland and the other in a former shipyard.

Lennar's Mr. Jones said the company's interest in the region comes as "the Bay Area combines an extremely robust job market with a tight housing market—creating significant opportunity for home builders." (at the expense of the safety of the citizens of Fremont County)

Like the two projects in San Francisco, the Fremont Development has considerable upfront infrastructure costs. Lennar is expected to spend up to $100 million on infrastructure including roads, open space and a school. Lennar plans to spend about $1 billion on the residential portions of the project, while it plans to sell off the commercial sites to other developers.

That initial investment is slated to start as soon as this summer, according to Fremont's Ms. Von Borck, with the total build-out expected to happen over 15 years. For now, demand appears strong.

"We happen to be at a really good spot in the market," she said.

THE DEFENDANT

THE OFFICE OF ENVIRONMENTAL PROTECTION FOR THE IX DISTRICT WAS MANDATED TO REVIEW EACH OF THE REPORTS PREPARED BY THE CITY OF FREMONT COMMUNITY DEVELOPMENT.

THE DANGER OF CATISTROPHIC EARTHQUAKES ON THE CITIZENS OF FREMONT IN THE WARM SPRINGS PLAN IS IGNORED.

IN SUPPORT OF THE WARM SPRINGS PROJECT AND TO INVESTIGATE THE EXISTENCE OF NONDISCLOSED REPORTS PREPARED BY TESLA MOTORS, INC., LENNAR HOMES, TOLL BROTHERS, AND VALCO LLC – BEFORE APPROVING ANY

FINAL ENVIRONMENTAL IMPACT ASSESSMENT (EIA) CONCERNING THE PROBABLITY AND CATASTROPHIC DAMAGE OF FUTURE EARTHQUAKES ON OR SURROUNDING SUBJECT PROJECT.

NONE OF THE ENVIRONMENTAL IMPACT STATEMENTS OF THE CITY OF FREMONT AND THEIR SELECTED NINE EXPERTS DEAL WITH THE PROBABLITY IF NOT CERTAINTY OF FUTURE MAJOR EARTHQUAKES FROM BOTH HAYWARD FAULT AND RODGERS CREEK AND CALAVERAS FAULTS.

THE FAILURE OF THE CITY OF FREMONT, ITS MAYOR BILL HARRISON AND JARED BLUMENFELD MANDATE A STAY OF THE SUBJECT PROPERTY TO INCLUDE CERTIFICATION THAT PROPOSED PROJECT PROTECTS CITIZENS OF FREMONT FROM A CATASTROPHIC EARTHQUAKE DAMAGE.

## PROBABILITY OF FUTURE ACTIVITY OF THE HAYWARD FAULT ZONE (EXHIBITS 14 & 15)

The recent movie "San Andreas" released May 29, 2015 depicting the catastrophe in San Francisco and this area starring Dwayne Johnson highlights the total abject failure of the defendants to completely and accurately assess the effects of a major earthquake on the subject property.

There is no discussion in any of the subject reports in the Administrative Record that discuss how the defendants enumerate the construction companies have adequate construction measures in place for the anticipated 500,000 people that will travel in and out of a bloated and congested Fremont BART station, less than a half[11] mile from the Tesla Auto Production plan

---

[11] Quotes are taken directly from Exhibits.

3

3

INSURED AGAINST EARTH MOVEMENT. (Earthquake insurance is not only quite expensive, it tends to be burdened with huge deductibles – at least 15 percent). **DEPENDING ON SEASONAL WEATHER CONDITIONS AT THE TIME OF A MAJOR EVENT A SEISMIC EVENT COULD BE FOLLOWED BY HUGE URBAN LANDSLIDES IN SATURATED SOILS. IN [12]ADDITION TO DIRECT DAMAGE THE EFFECTS ON COMMERCE DUE TO DAMAGED INFRASTRUCTURE WOULD ALSO BE SUBSTANTIAL. EXPERIENCE WITH LARGE AREA URBAN DESTRUCTION SUCH AS CAUSED BY EARTHQUAKE, HURRICANE, AND FIRESTORMS HAS SHOWN THAT COMPLETE REBUILDING CAN TAKE UP TO A DECADE, OWING TO VARIOUS FACTORS INCLUDING DISPUTES WITH INSURANCE COMPANIES, A LACK OF QUALIFIED LOCAL BUILDERS, SHORTAGES OF SUPPLIES, AND AN INFLUX OF CONTRACTORS FROM OUTSIDE OF THE REGION OF DUBIOUS QUALIFICATIONS WITH NO INCENTIVE TO MAINTAIN AND ENHANCE A LOCAL REPUTATION."**

**"THE PROGRESSIVELY MORE SEVERE REPORTS AND ESTIMATES OF EVEN PROBABILITY AND CONSEQUENCES HAVE AWAKENED A BROAD INTEREST IN TRAINING PEOPLE FOR EMERGENCY REPSONSE. IT IS BECOMING WIDELY UNDERSTOOD THAT PROFESSIONAL FIREFIGHTING, POLICE, AND MEDICAL SERVICES WILL BE OVERWHELMED BY A MAJOR EVENT AND THAT NEIGHBORS WILL HAVE TO ASSIST EACH OTHER AS BEST THEY CAN. APPROPRIATE ARE REPONSE ORGANIZATIONS WOULD LIKE BE SIMILAR TO THE 1950S CIVIL DEFENSE STRUCTURE, BUT SUCH CIVILIAN**

---

[12] [12] Quotes are taken directly from Exhibits.

**PARTICIPATION HAS YET TO BE ORGANIZED.**

**IN 2012, USGS SCIENTISTS SAID THE FAULT IS DUE FOR ANOTHER MAGNITUDE 6.8 TO 7.0 EARTHQUAKE, WITH THE CALIFORNIA GEOLOGICAL SURVEY CONCURRING, STATING THEY BELIEVE THERE IS A 31 PERCENT CHANCE OF A MAGNITUDE-6.7 EARTHQUAKE OR GREATER ALONG THE ROGERS CREEK-HAYWARD FAULT IN THE NEXT 30 YEARS.**

The attached Administrative Record submitted by the City of Fremont and their attorneys fails in any supplemented fashion to address the proposed Warm Springs Project and its attendant separate environmental impact statements on the massive catastrophes that will result by the neglect of the mandate responsibility of Mr. X of the Environmental Protection Agency to halt this project ." **(EXHIBITS 7, 10,11, AND 15)**

No individual or cumulative reports assess the risk of catastrophe against the billions in construction costs and profits to be made by the defendants.

In addition, no environmental report considers the combination of a magnitude 8.0 earthquake and  the resulting fires from ruptured Chevron fuel pipes, PG&E gas pipes that are over 30 years of age (San Bruno fire), and the explosions resulting from fires at the Tesla plant spewing toxic fumes which have neither been analyzed nor discussed in the EIR reports or severe water shortages now or if the Site is built. **(EXHIBIT 18)**


**<u>CONCLUSION</u>:**

It is a stunning fact that in none of the initial or Final E.I.R'S, nor in the numerous report of the First Carbon and their export Environmentalists, contained in my attached twenty-eight (28) Exhibits attached to this Petition that the Real Party in Interest, TESLA MOTORS, is

identified, underground toxins and toxic air penetrating into Lennar and Toll Brother

underground properties from toxic water and seepage areas in Warm Springs. The Warm

Springs Project is built for Tesla Motors, but the presence of all its pollutants on Warm

Springs is not examined  and tested for E.P.A Violations, by E.P.A, or any of the Defendants.

The 680 and 880 freeways area, a "Traffic Armageddon" 12 Hours a Day (EXHIBIT 12), is a

clear Violation of EPA Standards.

## VIII. CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

#### Against Defendant Environmental Protection Agency

Mr. Jared Blumenfeld in his official capacity was mandated and failed to investigate and

prepare and failed to file after investigation with respect to the Warm Springs Project in Fremont,

California the following approvals as a result of investigations by appropriate offices of the

Environmental Protection Agency, District 9, San Francisco, California which preclude the City

of Fremont, California, Lennar Corporation, Toll Brothers, and Valco LLC from proceeding with

these projects.

Major Federal Action (NEPA):  All environmental permits or approvals that constitute a

"major federal action" are subject to the requirements of NEPA (discussed below), which

requires (among other things) that all reasonable alternatives to the proposed action, including

alternative locations, be considered fully.  Community residents can use this opportunity to

identify alternative locations that may have fewer or less serious impacts on communities that

already face disproportionate environmental threats, or locations that pose less threat to all

communities.

Water (CWA):  Permits may not be issued for discharges of dredge or fill material into surface waters, including wetlands, if there is a "practicable alternative" with less impact on the aquatic environment.  Community residents may have particular interest in these decisions, especially in certain areas.  For example, wetlands and other waters may support fish and wildlife populations used by communities for subsistence or commercial hunting and fishing purposes; they may filter pollution to keep other waters clean for drinking water and other uses; and they may prevent flooding in communities located near adjacent water bodies. Such discharges and filling of important water bodies can be prevented if the permitting agency (the Army Corps of Engineers or some states) is provided information about viable alternatives, such as conducting the activity in another location (possibly one in which no filling is needed).

Air (CAA):  Special procedures are required before a major new source of air pollution is allowed.  In areas in which air quality standards are already violated, new source permits may be issued only after the agency evaluates alternative sites for the facility (along with production methods and pollution control techniques), and only after a showing that the benefits from the proposed  new source will be greater than the environmental and social costs.  Community residents can play a key role in documenting the environmental and social costs of a major new source of air pollution, especially in terms of economic, human health and quality of life costs imposed on communities that already face high levels of environmental or other health threats.

Hazardous Waste  (RCRA):  EPA has developed location standards that may limit the siting of hazardous waste treatment, storage, and disposal facilities.  Community residents can provide  helpful information about pre-existing levels and areas of pollution, and common uses of the property where a new or expanded facility will be built.  This can help the state or EPA decide whether a proposed hazardous waste activity will be sited appropriately.

<u>SECOND CAUSE OF ACTION</u>

**Against All Defendants for Violation of the Administrative Procedure Act and the National Environmental Policy Act (42 U.S.C. § 4321 et seq.)**

\#      Plaintiff realleges and incorporates, as if fully set forth herein, each and every allegation contained in paragraphs 1 through 75, inclusive, of this Complaint.

\#      NEPA requires federal agencies to prepare a detailed Environmental Impact Statement ("EIS") for all actions that are (1) federal, (2) "major," and (3) that may have a significant effect on the human environment. 42 U.S.C. § 4332(2)(C); Nat'l Wildlife Fed. v. Espy, 45 F.3d 1337, 1343 (9th Cir. 1995). Common categories of "major federal actions" include: (1) the "[a]doption of formal plans, such as official documents prepared or approved by federal agencies which guide or prescribe alternative uses of Federal resources, upon which future agency actions will be based;" (2) "systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive;" and (3) "[a]pproval of specific projects, such as construction or management activities located in a defined geographic area" including "actions approved by permit or other regulatory decision as well as federal and federal assisted activities." 40 C.F.R. § 1508.18(b)(2), (3), (4). Defendants' issuance of the BiOp containing directions to impose the RPA constitutes a major federal action that may have a significant effect on the environment.

\#      Defendants are Federal Government agencies or officials that took final agency action within the meaning of the APA by issuing the BiOp. See Bennett v. Spear, 520 U.S. at 178; Ramsey v. Kantor, 96 F.3d 434 (9th Cir. 1996); Westlands Water Dist. V. United States, 850 F. Supp. 1388, 1422 (E.D. Cal. 1994).

\#       The BiOp was issued and implemented as part of an interconnected set of agency actions, under which Defendants had ultimate control over the requirements set forth in the RPA for the take authorization to be applicable.  See generally Bennett v. Spear, 520 U.S. at 169, 170 (determining that a biological "has a powerful coercive effect on the action agency" and that such opinions have a "virtually determinative effect"); see also Westlands Water Dist. v. United States, 850 F. Supp. At 1422 (recognizing that the Bureau's options are "narrow" should it decline to follow NMFS's RPAs).

## THIRD CAUSE OF ACTION

### Cost Recovery under CERCLA section 107(a)

\#       Plaintiff repeats and realleges each and every allegation contained in previous paragraphs in this compliant as though fully set forth.

\#       Plaintiff is informed and believes, and on that basis alleges, that defendants Lennar, Toll Brothers, Valco may transport or arranged for transport of hazardous substances which it owned now or possessed to the Warm Springs Site, and stored, treated, and disposed of hazardous substances at the Site, and otherwise the Site during the time that hazardous substances were disposed of at the Site.  Defendants are thereby jointly and severally liable under section 107(a) of CERCLA, title 42, section 9607(a) of the United States Code, for any transportation of Hazardous Materials at the Warm Springs Site.

\#       Plaintiff is informed, and believes, and on that basis alleges, that the Site is a facility, as that term is defined in CERCLA, title 42, section 9601(9) of the United States Code.

\#      Plaintiff is informed and believes, and on that basis alleges, that a release or threatened release of a hazardous substance, as those terms are defined in CERCLA, at title 42, sections 9601(22) and (14), has occurred at the Site.

\#      Plaintiff did not cause or contribute to the environmental contamination of the Site and denies that it is liable for costs incurred as the result of the alleged release or threatened release of hazardous substances at the Site.

## FOURTH CAUSE OF ACTION

**[Failure to Make Adequate Sites Available With High-Density Zoning To Accommodate City's Lower-**

**Income Housing Need (Code Civ. Proc.  § 1085) [All Defendants]**

\#      Plaintiffs incorporate by reference herein each and every allegation of this complaint's

paragraphs inclusive, above.

\#      The Housing Element Law, and in particular Government Code section 65583 ©, requires each local Housing Element to contain a program with a five-year schedule of actions the local government is undertaking or intends to undertake to implement the policies identified in the Housing Element through (a) the administration of land-use and development controls, (b) the provision of regulatory concessions and incentives, and (c) the utilization of appropriate federal and state financing and subsidy programs when available.  In order to make adequate provision for the housing needs of all economic segments of the community, the program shall identify adequate sites which will be made available through appropriate zoning and development standards and with services and facilities needed to facilitate and encourage the development of a variety of types of housing for all income levels, including multifamily rental

housing, factory-built housing, mobile homes, housing for agricultural employees, emergency shelters, and transitional housing in order to meet the community's identified housing goals.

#       The Least Cost Zoning Law, Government Code sections 65913 and 65913.1, requires every city  to designate and zone sufficient vacant land for residential use at densities and development standards appropriate for the production of ho using at the lowest possible cost to meet the housing needs for all income categories as identified in the Housing Element, including the housing needs of lower- and moderate-income households.   In particular, it requires every California city to "designate and zone sufficient vacant land for residential use with appropriate standards, in relation to zoning for nonresidential use, and in relation to growth projections of the general plan to meet housing needs for all income categories as identified in the housing element of the general plan," Gov. Code § 65913.1, and to do so "within the five-year planning period."

#       The Legislature has found and declared, in Government Code section 65913(a), that there exists a severe shortage of affordable housing, especially for persons and families earning low and moderate incomes, and that there is an immediate need to encourage new housing development, not only through provision of financial assistance, but also by:

Expediting the local and state residential developmental process;

Assuring that local governments zone sufficient land at densities high enough for production of affordable housing; and Assuring that local governments make a diligent effort through the administration of land-use and development controls and the provision of regulatory concessions and incentives to significantly reduce housing development costs and thereby facilitate the development of affordable housing, including housing for families.

\#      Program 19.1 in the Housing Element of the City of Fremont's General Plan requires the

City, within one year of adoption of the Housing Element, to complete land use studies to

identify for conversion as many of the sites identified in Table IV-6 from non-residential to high-

density residential use as are necessary at appropriate densities (for example, approximately 30

acres at 30 units per acre or 40 acres at 20 units per acre) to meet the City's regional housing

need goal.  It further requires the City to follow through with appropriate modifications to the

Land Use Element and rezonings as soon as possible, but no later than June 2004.  The City has

acknowledged that it committed to implementing Program 19.1 (See Exh. 1, p. 6 ("[T]he

Housing Element, adopted in 2003, include a program (Program 19.1) that committed the City to

rezoning approximately 30 to 40 acres of land sufficient to accommodate an additional 871 high-

density, multi-family housing units.")."

\#      Each of these statutory and General Plan provisions independently imposes on the City of

Fremont a present mandatory duty (1) to select specific sites in the Housing Element for

rezoning for lower income housing; (2) to specify densities for the rezoning of each of those sites

in the range of at least 30 units to the acre, in order to make lower-income housing economically

feasible; (3) to designate the selected sites for high-density residential use in its General Plan,

and to rezone the selected sites at the specified densities; and (4) to complete all of these steps

during the 1999-2007 Planning Period, or sooner.

\#      The 1999-2007 Planning Period has ended, yet the City of Fremont has failed in its duty

to take each of the following steps, either in a timely fashion or at any time up to the present:

The City failed to designate specific sites for rezoning for lower-income housing in the adopted Housing Element of its General Plan, and has failed to designate specific sites for rezoning at any time since the adoption of its Housing Element.

The City has failed to specify densities in the range of at least 20 to 30 units to the acre for the rezoning of each of those sites.

The City has failed to rezone any sites for residential densities in the range of 20 to 30 units per acre.

The City was required to complete all of these steps within the 1999-2007 Planning Period, and early enough in the 1999-2007 Planning Period to allow developers to build the housing during that Planning Period. It failed to do so by June 2004 and has failed to do so at any time up to the present.

#       The City's General Plan, including its Land Use Element and General Plan Land Use Map, fails to designate sufficient vacant land at sufficient densities and with appropriate standards to meet the housing needs' for all income categories as identified in the Housing Element, including the housing needs of very-low and low-income households.

#       The City has failed to zone sufficient vacant land at sufficient densities and with appropriate standards to meet the housing needs for all income categories as identified in the Housing Element, including the housing needs of very-low and low-income households.

#       The City has failed to expedite the local development process, and failed to make a diligent effort through the administration of land-use and development controls and the provision

of regulatory concessions and incentives to significantly reduce housing development costs and thereby facilitate the development of affordable housing, including housing for families.

\#      These failures, including the failure to designate and zone sufficient vacant land for high-density residential use, as alleged herein, independently violate mandatory duties of the City of Fremont arising from three separate sources.   Specifically, as a consequence of its failure to comply with its mandatory duty to take the foregoing actions, the City of Fremont has failed, and continues to fail, to comply with

(1) its mandatory duties under the Housing Element Law to provide for the housing needs of all

(2) economic segments of the community (Gove. Code section 65583), (2) its mandatory duties under the Least Cost Zoning Law to designate and to zone sufficient vacant land for residential use at densities appropriate for the production of housing at the lowest cost possible to meet the housing needs for all income categories as identified in the Housing Element, including the housing needs of lower-income households (Gov. Code § 65913.1), and (3) its mandatory duties under Housing Element Program 19.1.

\#      Petitioner is directly and beneficially interested in the City of Fremont's compliance with all applicable provisions of law and with all of its legal duties, as set forth herein.   They are interested as citizens in having the laws executed and the public duty enforced.   Moreover, the City's duty to accommodate its share of the regional need for affordable housing is sharp, and the public's need for such housing is weighty.   Petitioner has standing to bring this claim for writ of mandate, both on behalf of the public interest and as a result of his beneficial interest, as set forth above.

\#      At all times relevant to this action, the City of Fremont has had the ability to perform the legal duties set forth herein; and has refused to perform those duties.

\#      Unless compelled by this Court to perform those acts and duties and to refrain from acts as required by law, by its Mayor Bill Harrison, the City will continue to refuse to carry out those duties and will continue to violate the law, and Petitioner has standing to insure that lower-income persons and affordable housing developers and/or housing service providers will continue to be injured as a result, by the actions of the Mayor and City of Fremont in implementing the Warm Springs Plan.

\#      Wherefore, Petitioner prays for a writ of mandate and for declaratory and injunctive relief, as set forth below.

FIFTH CAUSE OF ACTION

**(General Plan Inconsistency (Gov. Code § 65300.5) [All Defendants]**

\#      Plaintiff incorporates by reference herein each and every allegation of paragraphs 1-106, inclusive, above.

\#      Government Code section 65300.5 provides that the General Plan and its Elements shall "comprise an integrated, internally consistent and compatible statement of policies for the adopting agency." A General Plan is invalid if its programs or policies are internally inconsistent and in conflict with one another.

\#      As alleged above, the Land Use Element of the City of Fremont's General Plan includes both a Housing Cap and a Growth Management Program which, individually and jointly, pose an

absolute numerical conflict that make it impossible for the City of Fremont to accommodate the unmet portion of its RHNA share for the 1999-2007 Planning Period, make it impossible for the City of Fremont to accommodate the unmet portion of its RHNA share for the 2007-2014 Planning Period, and will make it impossible for the City of Fremont to accommodate its RHNA share for all future Planning Periods. The City of Fremont has refused to repeal or amend those laws, and instead continues to enforce them. Furthermore, the City of Fremont continues to enforce Program 15.1, independently preventing it from accommodating the unmet portion of its share of the lower-income RHNA.

\#      At all times relevant to this action, the City of Fremont has had the ability to perform the duties set forth herein, and has failed and refused to perform its legal duties.

\#      Unless compelled by this Court to perform those acts and duties and to refrain from acts as required by law, the City of Fremont will continue to refuse to carry out those duties and will continue to violate the law, and Petitioner and other lower-income persons will continue to be injured as a result.

\#      This cause of action is ripe for adjudication.

\#      Wherefore Plaintiff prays for a declaratory and injunctive relief, as set forth below.

SIXTH CAUSE OF ACTION

**MY CIVIL RIGHT UNDER THE FOURTEENTH AMENDMENT**

**( Violation of Due Process Clause of the California Constitution (Cal. Const. art. I, § 7(a))**

**[All Defendants]**

\#      Plaintiff incorporates by reference herein each and every allegation of this compliant.

\#      The exercise of a city's police owners is invalid under the Due Process Clause of the
California Constitution, art. I, § 7(a), if it is not reasonably related to the public welfare.  Where
the city ordinances of the City of Fremont, influences the supply and distribution of housing for a
metropolitan region, it must be "reasonably relate[d] to the regional welfare."

\#      Petitioner is directly and beneficially interested in the City of Fremont's compliance with
all applicable provisions of State law and with all of its legal duties, as set forth herein.
Petitioner is an interested citizen in having the laws executed and the public duty enforced.
Moreover, the City of Fremont's duty to accommodate its share of the regional need for
affordable housing is sharp, and the public's need for such housing is weighty.  Petitioner has
standing to bring this claim for writ of mandate on behalf of the public interest and as a result of
their beneficial interest, as set forth above.

\#      At all times relevant to this action, the City of Fremont and Mayor Bill Harrison has had
the ability to perform the duties set forth herein, and has failed and refused to perform its legal
duties.

\#      Unless compelled by this Court to perform those acts and duties and to refrain from acts
as required by law, the City of Fremont will continue to refuse to carry out those duties and will
continue to violate the law, this Petitioner's Civil Rights have already and will be continued to be
violated by the Defendants in a scheme for Gross Profits to allow Pollution Violations.

\#      This cause of action is ripe for adjudication.

\#      Wherefore Plaintiff prays for a writ of declaratory and injunctive relief, as set forth
below.

## IX. REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests that this Court:

1. Declare the operating permits and certificates granted to Lennar Corporation and Toll Brothers invalid; issued by the City of Fremont, California to the defendants Lennar Corporation, Toll Brothers and Valco LLC, under the Environmental Declaration of July 23, 2014 and the Resolution No. 2014, a resolution of the City Council of the City of Fremont certifying the Environmental Impact Report, making findings required by the California Environmental Quality Act, adopting the Mitigation Monitoring and Reporting Program, and stating overriding considerations in the adoption of the Warm Springs/South Fremont Community Plan, to be in violation of the sections of the Environmental Protection Act that violate the Clean Air Act, the Clean Water Act, the Hazardous Materials Act and the Toxic Substances Control Act (TSCA) Compliance Monitoring.

2. Order the Environmental Protection Agency by its Director, Gina McCarthy, in her official capacity as Administrator, and Jared Blumenfeld, as Regional Director of Region 9, San Francisco, California of the Environmental Protection Agency, to immediately conduct a complete Agency review of the Warm Springs/South Fremont Community Plan and the final Environmental Impact Reports to determine their truth and accuracy and file their findings and conclusions with this Court prior to permitting the defendants Lennar Homes, Toll Brothers and Valco LLC to proceed with any construction near the TESLA Motors plant in Fremont, California.

3. Issue an injunction rescinding the permits and certificates, and enjoining the City of Fremont from taking any further action whatsoever to allow the operation of the Warm

Springs/South Fremont Community Plan, including Lennar Corporation, Toll Brothers, and the City of Fremont and enjoin the defendants from using their current procedures in evaluating this and other permit applications;

Order the defendants Lennar Corporation, Toll Brothers and City of Fremont to pay plaintiff's reasonable expert witness fees;

That the Court order the Environmental Protection Agency to perform adequate and complete environmental review of the City of Fremont's Environmental reports pursuant to the provisions of the National Environmental Policy Act;

That the Court retain jurisdiction over this matter until such time as Defendants have fully complied with the Court's Orders for the protection of this plaintiff and the citizens of Fremont, California;

That the Court award Plaintiff its cost of litigation, including reasonable attorneys' fees and expert witness fees; and  That the Court grant Plaintiff such further and additional relief as the Court may deem just and proper.

4. Declare that Defendants' failure to act as complained of herein constitutes a failure to perform a nondiscretionary duty required by 42 U.S.C. § 7410(k)(1)(B), (k)(2), and within the meaning of 42 U.S.C. § 7604(a)(2); Issue a mandatory injunction requiring EPA to immediately perform its mandatory duty; Retain jurisdiction over this action to

ensure compliance with the Court's orders;Award Plaintiffs their reasonable costs of litigation, including attorneys' fees, pursuant to 42 U.S.C. § 7604(d); and

5.  Find and declare that the defendants City of Fremont, Lennar Corporation and Toll Brothers have violated Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000d *et seq.*, EPA civil rights regulations, 40 CFR Part 7, the 14th Amendment of the U.S. Constitution, and Title VIII of the Civil Rights Act of 1968, 42 U.S.C. §3604;

6.  Declare the operating permits and certificates granted to Lennar Corporation and Toll Brothers , Valco LLC, Invalid pending order of this count.

7.  Enjoin Mayor Bill Harrison of the City of Fremont from using its current procedures in evaluating this and other permit applications;

8.  That the Court order Defendants to perform adequate and complete environmental review of the City of Fremont's Environmental reports pursuant to the provisions of the National Environmental Policy Act;

9.  Order the Environmental Protection Agency to develop and adopt a comprehensive protocol for reviewing permit applications that will prevent the granting of permits to Tesla Motors pending a Complete Environmental Inspection, suspending its permit of Operation Pending Certification.

10. That the Court order the Environmental Protection Agency to perform adequate and complete environmental review of the City of Fremont's Environmental reports pursuant to the provisions of the National Environmental Policy Act;

11. Order the defendants Lennar Corporation, Toll Brothers and City of Fremont to pay plaintiff's reasonable expert witness fees;

12. Find and declare that the defendants City of Fremont, Lennar Corporation and Toll Brothers have violated by civil rights under the 14th Amendment of the U.S. Constitution;

13. That the Court award Plaintiff its costs of litigation, including reasonable attorneys' fees and expert witness fees; and

14. That the Court retain jurisdiction over this matter until such time as Defendants have fully complied with the Court's Orders;

15. That the Court Grant Plaintiff such further and additional relief as the Court may deem just and proper.

    Declare that the Administrator is in violation of the <u>Clean Air Act, and Pollution Act Cited</u> with regard to his failure to perform each mandatory duty listed above;

    Retain jurisdiction of this matter for purposes of enforcing and effectuating the Court's order.

DATED:  June 26, 2015                    Respectfully submitted,

                                         /s/Shyam Chetal

                                         SHYAM CHETAL

                                         2090 Warmsprings Ct. Suite 280

                                         Fremont, CA  94539

                                         Phone:  (510) 366-1884

                                         ShyamChetal@yahoo.com

                                         *Petitioner*

COMPLAINT                                                                   57

Case No.#_____

# EXHIBIT LIST TO COMPLAINT:
## SHYAM CHETAL v. E.P.A, CITY OF FREMONT, LENNAR, ET AL.

**EXHIBIT #     IDENTIFICATION OF EXHIBIT**

1     Section 2 Land Area Use Mix Plan Warm Springs, Fremont, California
2     Bay Area Air Quality Management District Tesla Motors Inc. Major Facility Review Permit—October 8, 2010.
3     Petitioner Summary of Potentially Significant Impact Deficiencies and Dangers from the Executive Summary Prepared by First Carbon Solutions Report Potentially Significant Impacts-Hazards to Community as of June 1, 2012 (26)
4     City of Fremont—Warm Springs/South Fremont Community Plan Executive Summary
5     City of Fremont—Warm Springs/South Fremont Community Plan Draft EIR 3.6—Hazards and Hazardous Materials
6     Warm Springs/South Fremont Community Plan Draft Appendix Air Quality Supporting Information
7     ENGEO, Phase II Environmental Site Assessment August 22, 2014
8     Appendix D: Hazardous Materials Supporting Information
9     Section 6: Other CEQA Considerations significant unavoidable impacts
10    Section 3: Environmental Impact Analysis
11    Section 4: Cumulative Effects
12    Appendix E: Traffic Memorandum
13    Interstate 680 and Interstate 880 Traffic Summaries
14    California's Hayward Fault Revealed: Most Dangerous Urban Fault in America? U.S. Geological Survey on December 14, 2007.
15    Appendix C: Preliminary Geotechnical Exploration
16    Summary of Articles of Lennar Corporation—Warm Springs Project
17    Summary of Articles of Toll Brothers—Warm Springs Project
18    Hydrology and Water Quality Report by First Carbon Solutions
19    Utilities and Service Systems Report by First Carbon Solutions
20    D.3—Phase II Environmental Site Assessment by Frist Carbon Solutions
21    Final Environmental Impact Report Warm Springs/South Fremont Community Plan City of Fremont, Alameda County California Prepared by First Carbon Solutions—June 19, 2014.
22    First Amended Petition for Writ of Mandamus: Administrative Mandamus; Declaratory Relief Case #HG 14737711, January 12, 2015.
23    Industry New Article of "Tesla Gets $15M California Tax Credit, but also Gets Some Flak", June 19, 2015
24    Project Vicinity Map—Warm Springs/South Fremont Community Plan

1

Documents & Other Resources

25    E.2—Phase I Environmental Site Assessment—Baseline Consulting 8/2015

26    Appendix E: Hazardous Materials Studies—TRC Company 2/13

27    EDR Data Mod—Listing Hazardous Sites/Tesla

28    Bart Comments on Warm Springs Plan 4/22/13